**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § § | **COMPLAINT FOR FORFEITURE *IN REM*** |
| **v.** | § § | |
| **APPROXIMATELY 581,761 USDT** | § § | *CIVIL ACTION NO.* |
| **Defendant, *in rem.*** | § § § | **26-cv-1010** |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against 581,761.620229 USDT, hereinafter referred to as "Defendant Property", and alleges as follows:

**STATEMENT OF THE CASE**

1.      Criminals believed to be located abroad, their associates, and conspirators together stole funds from one or more victims. The funds were then laundered through a series of virtual currency addresses, and some virtual currency exchanges, to evade detection and hide the origin of the funds. The United States Secret Service (USSS), investigated, traced, and seized the Defendant Property, which constitutes proceeds traceable to those thefts and property involved in, and traceable to, this money laundering scheme.

2.      The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities, and most importantly, to recover assets that may be used to compensate victims.[1]

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

**JURISDICTION AND VENUE**

3.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4.      This Court has subject matter jurisdiction over the Defendant Property under 28 U.S.C. § 1345, because the United States is the plaintiff, and 28 U.S.C. § 1355(a), because this is an *in rem* forfeiture proceeding.

5.      Venue is proper in this judicial district under 18 U.S.C. § 3238 and 28 U.S.C. §§ 1355(b) and 1395(a) and (b).

**NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE**

6.      The United States files this *in rem* forfeiture action to seek forfeiture of Defendant Property as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343, 1349, 2, and 3, and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), 1956(h), and 2, and 3.

7.      Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8.      18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9.      18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to any offense, or a conspiracy to commit an offense, constituting "specified

unlawful activity" as defined by 18 U.S.C. § 1956(c)(7). A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A), by way of 18 U.S.C. § 1961(1)(B).

10.     18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

11.     18 U.S.C. § 1349 provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

12.     18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty of concealment of money laundering.

13.     18 U.S.C. § 1956(a)(2)(B)(i) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole

or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, commits international money laundering.

14.    18 U.S.C. § 1956(h) provides that any person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

## PROPERTY INFORMATION

15.    The Defendant Property is 581,761.620229 USDT, which is the equivalent to approximately $581,761.62 in U.S. dollars (USD).

16.    Virtual currency in an amount equivalent to the Defendant Property (the "Subject Currency") was previously associated with the following virtual currency address (the "Subject Address"):

    a.    0xCaB3644BdeEf0fdb41dE86D386C967C5a31f172D

17.    Tether International S.A. de C.V. ("Tether") destroyed or "burned" the Subject Currency and reissued the Defendant Property to a United States law enforcement-controlled virtual currency address.

18.    The Defendant Property is currently in custody and control of the United States.

## STATEMENT OF FACTS

### Background on Cryptocurrency

19.    Virtual Currency: Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency

4

generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

20.     Blockchain: A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

21.     Blockchain Analysis: Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable,

free open source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

22.    Virtual Currency Address: A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

23.    Virtual Currency Exchange: A virtual currency exchange ("VCE"), also called a virtual currency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

24.    Virtual Currency Wallet: A virtual currency wallet (e.g., a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

25.    Unhosted Wallet: An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (e.g., a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own unhosted wallet addresses.

26.     Hosted Wallet: A hosted wallet, also known as a custodial wallet, is a virtual currency wallet through which a third party, e.g., a virtual currency exchange, holds a user's private keys. The third party maintains the hosted wallet on its platform akin to how a bank maintains a bank account for a customer, allowing the customer to authorize virtual currency transactions involving the hosted wallet only by logging into/engaging with the third party's platform.

27.     Decentralized Exchange: A decentralized exchange (or "DEX") is a peer-to-peer marketplace where users can trade virtual currencies directly with other traders without centralized intermediaries. Users generally retain control over their virtual currency rather than entrusting a central authority to host funds in a centralized or "hosted" wallet. DEXs are operated by self-executing agreements written in code, known as "smart contracts," which automate the trading process. DEXs will algorithmically track the prices of various virtual currencies and often leverage locked reserves of virtual currencies (or other digital assets). These locked reserves are known as "liquidity pools," and they are often used to facilitate trades. DEXs are built on blockchains that support smart contracts, including Ethereum, and often levy fees for their services.

28.     Transaction Fee: A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (e.g., Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who

maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

29.     Stablecoins: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

30.     Tether: Tether International S.A. de C.V. is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

31.     Ether: Ether ("ETH") is a virtual currency that is the native token used by the Ethereum blockchain, which is a blockchain with smart contract functionality.

### Background on Cryptocurrency Investment Fraud

32.     The USSS is investigating cryptocurrency investment fraud ("CIF") schemes, often referred to as "pig-butchering," a term derived from the Chinese-language word used to describe this scheme and its treatment of victims. In 2024 alone, more than 41,000 complaints of CIF were received by the FBI's Internet Crime Complaint Center (IC3), resulting in $5.8 billion in reported losses.[2] CIF schemes are often orchestrated by Asia-based criminal syndicates, predominately operating in southeast Asia.

33.     In CIF schemes, criminals contact potential victims through seemingly misdirected text messages, dating applications, or other online platforms/forums with the goal of building rapport and relationships with the victims.

---

[2] *See* Fed. Bureau of Investigation, Internet Crime Report 2024 at 36, https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

34.     Once that trust is established, the criminal recommends virtual currency investment by touting their own, or an associate's success in the field. Investment methods vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The subject usually instructs and/or assists the victim with opening an account on a centralized virtual currency exchange, such as Coinbase or Crypto.com, and then walks the victim through transferring money from a bank account to that virtual currency exchange account. Next, the victim will usually receive instructions on how to transfer their virtual currency assets to the fake investment platform. On its surface, the platform typically shows lucrative returns, encouraging further investment. However, in reality, all deposited funds are routed to a virtual currency address controlled by the criminals.

35.     In CIF schemes, the subjects will continue to encourage investments until victims have depleted their savings. Oftentimes, the subject will attempt to continue the scheme by coaching victims on taking out loans against their homes or borrowing money from friends and family. Inevitably, these victims generally run out of money and make attempts to withdraw their funds. However, victims are unable to do so and are provided various excuses as to why. For example, subjects will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by subjects to elicit more money from victims; ultimately, victims are locked out of their accounts and lose all their funds. Even when victims procure enough funds to pay these "taxes," the subjects will continue to concoct new excuses and fees for victims to pay.

**Wire Fraud Scheme**

36.      On or about April 6, 2025, the United States Secret Service ("USSS") received a call reporting a fraud scheme involving cryptocurrency. The USSS interviewed the caller ("Victim-1") and collected evidence related to the complaint. The USSS also reached out to request a written narrative from Victim-1 on or about May 30, 2025, and interviewed him in person on July 24, 2025. Victim-1's son was also present during the in-person interview.

37.      Victim-1 was added to a WhatsApp[3] group chat called "Norris Advancement Group 03" ("Group-1") sometime around October 2024. According to chat history provided by Victim-1, the group chat was active starting July 2024. In the narrative provided on May 31, 2025, this group chat initially appeared to provide "stock market analysis" and investment insights. At least one of the Community Admins[4] appeared to be in the group under a fictitious name, i.e. "Bruce Wayne" (Figure 1). The Community Admins appeared to thank the "analysts" for their trading "signals." Chat history showed these trading signals were ostensibly predictions related to cryptocurrency trades (Figure 2 below).

///

///

///

---

[3] WhatsApp is a communications platform with end-to-end encryption. In my training and experience, this encryption makes it a common mean of communication in cryptocurrency scams.

[4] According to WhatsApp, Community Admins in WhatsApp group chats can manage their communities on WhatsApp by being able to add or remove members, creating or deactivating group chats, or changing chat information like the name, description, and profile photo.

*Figure 1*



*Figure 2*

```
[9/18/24, 6:56:22 PM] ~ William A. T. Norris: *Trading Announcement!!!*
*Today's upcoming trading signals will be released in 15 minutes, so
please schedule your time, organize your account funds and contact
your personal assistant in time to receive trading signals.*

* ❗ trading signals*

* 📈 Currency: BTC/USDT*

* 💰 Expected return: 30% or more*

* ⭕ Position: 25%-50% of total funds*

*As each member's capital situation is different, in order to avoid
operational errors, please contact the assistant for stop-loss and
take-profit settings operation entrance*
```

38.    Within a few days of Victim-1 being added to Group-1, members of the chat began promoting a cryptocurrency investment platform called absgbl [5] (the "suspect website"). The Community admins also claimed this platform was a registered money service business (MSB) under the name "Absgloba" (Figure 3). Based on a query of the name in Financial Crimes Enforcement

---

[5] Law enforcement databases show this domain was registered July 16, 2024, through registrar Gname.com Pte. Ltd.

11

Network's MSB Registrant Search on July 28, 2025, the only registrant under that name appears to be Absgloba Investment Ltd., an unrelated investment firm out of Denver, CO.

39.     Scammers often use names similar to reputable businesses to make their scheme appear legitimate. In this case, the scammers appeared to use Absgloba Investment Ltd.'s MSB registration to make absgbl.cc seem like a regulated investment platform. The MSB Registrant Search did not yield any results for search terms "absgbl" or "abs global."

*Figure 3*

```
[9/5/24, 4:30:41 PM] ~ Collin Ramirez: The trading platform we use is
regulated, so don't worry.
[9/5/24, 4:48:35 PM] ~ [REDACTED]          How can I prove that this is a
legitimate platform?
[9/5/24, 4:57:48 PM] ~ Collin Ramirez: You can look up Absgloba at MSB.
[9/5/24, 5:02:18 PM] ~ [REDACTED]         What is MSB?
[9/5/24, 5:29:39 PM] ~ Joshua Candal: Regulatory status is commonly
referred to as MSB. MSB is a financial license regulated and issued by
the Financial Crimes Enforcement Council (FinCEN), a division of the U.
S. Department of the Treasury. The MSB license is also the standard
license for digital currency exchanges around the world, and is held
by companies such as Coinbase, Bitfinex, Poloniex, Huobi, etc. NHB
also holds an MSB license.
```

40.     Some members of the group also claimed to be making a profit from the trading strategies "signaled" by the analysts. At some point during the scam, Victim-1 contacted a member of the WhatsApp group (Member-1), using number +1 (213) 682-1441,[6] who communicated to Victim-1 that he was able to withdraw $2 million in profits by following analyst instructions (Figure 4). Victim-1 attempted to call this number via a WhatsApp call but was not successful.

///

///

---

[6] Databases LeadsOnline and Qintel Crosslinks were queried for the phone number but did not return any subscriber information.

///

*Figure 4*



41.     Lack of information on the phone number on law enforcement and commercial databases, as well as the number's promotion of "assistant instructions," suggest Member-1's account is owned or controlled by the perpetrators of the scam.

42.     On or about September 2024, Victim-1 messaged "Assistant-Joshua" ("Suspect-1") from Group-1, indicating his interest in investing. Suspect-1 directed him to the suspect website to register. On October 3, 2024, Victim-1 let Suspect-1 know he completed the registration. Victim-1 reports that, following the registration, Suspect-1 guided him through depositing funds and sending cryptocurrency through Victim-1's Robinhood and Coinbase accounts to Victim-1's Coinbase Wallet[7] 0xb7ad3cad356595017f0c67f6b32e03fd031ad38d ("0xb7ad") (Figures 5 & 6).

///

---

[7] Coinbase Wallet is a product of Coinbase Inc. and is separate from Coinbase. While Coinbase is an exchange that allows for the purchasing, selling, and transferring of cryptocurrency, Coinbase Wallet is a multi-coin non-custodial wallet.

13

///

*Figure 5*

```
[10/3/24, 11:34:43 PM] Assistant-Joshua: Let's try to send BTC to your
coinbase wallet
[10/3/24, 11:35:06 PM] Assistant-Joshua: Do you have time now? I'll
teach you every step.
[10/3/24, 11:35:23 PM] ███████    Can I send money to wallet?
[10/3/24, 11:36:01 PM] Assistant-Joshua: Do you mean buying
cryptocurrency through coinbase wallet?
[10/3/24, 11:36:11 PM] ███████    Yes
[10/3/24, 11:36:29 PM] Assistant-Joshua: How much are you going to buy
[10/3/24, 11:36:52 PM] ███████    Thinking to send $30k
[10/3/24, 11:37:42 PM] Assistant-Joshua: I do not confirm if it is
possible to send it immediately after you purchase it directly. If it
is not possible to send immediately you may have to wait 3-7 days. We
can try this first.
[10/3/24, 11:38:12 PM] Assistant-Joshua: What method of payment do you
use
[10/3/24, 11:38:26 PM] ███████    From my bank
[10/3/24, 11:39:02 PM] Assistant-Joshua: Let's try to buy
[10/3/24, 11:40:21 PM] Assistant-Joshua: It is better to buy ETH
directly, as wallet accounts need ETH for sending. And ETH is faster
```

*Figure 6*

```
[10/15/24, 7:52:28 PM] Assistant-Joshua: How much ETH is available in
the coinbase wallet right now?
[10/15/24, 7:56:20 PM] ███████    1.9
[10/15/24, 7:56:40 PM] Assistant-Joshua: Send ETH to trading account
address now
[10/15/24, 7:57:57 PM] ███████    Can I transfer after today's trading?
[10/15/24, 7:58:21 PM] Assistant-Joshua: yes
[10/15/24, 7:58:41 PM] Assistant-Joshua: Transfer first and trade
later, your profits are better, I think so
[U+200E][10/15/24, 8:00:54 PM] Assistant-Joshua: [U+200E]<attached:
00000551-PHOTO-2024-10-15-20-00-54.jpg>
[10/15/24, 8:02:47 PM] Assistant-Joshua: Can you finish sending 19kETH
to the trading account now? Please let me know if you need to send it
later
[10/15/24, 8:03:17 PM] ███████    I will send later
[10/15/24, 8:03:23 PM] Assistant-Joshua: OK
[10/15/24, 8:03:27 PM] ███████    1.9 ETH
[10/15/24, 8:04:39 PM] Assistant-Joshua: Did Robinhood transfer ETH to
coinbase wallet successfully yesterday and today?
```

43.    Victim-1 had both Robinhood and Coinbase accounts prior to getting involved in the scam. He has full and sole access to 0xb7ad. All transfers to the suspect addresses were made using 0xb7ad.

44.    On October 12, 2025, Suspect-1 guided Victim-1 through logging into absgbl, copying a deposit address, and pasting it to Coinbase Wallet to send ETH. On or about October 12,

2024, Victim-1 made his initial transfer in the amount of about 10.1 ETH to the "trading account address" 0x3A1A2294eb65C008DbBae0104004F70ba4CF32CE ("0x3A1A") as instructed by Suspect-1, who guided Victim-1 through locating the address on the suspect website and copying it over to Coinbase Wallet to be sent ETH (Figure 7). Victim-1 was repeatedly instructed by Suspect-1 to continue sending ETH to the "trading account" (Figure 6).

*Figure 7*



45.     Following multiple transfers, Victim-1 was invited to a second WhatsApp group, "Contract Trading VIP -99L" ("Group-2") on or about October 17, 2025. Victim-1 was told he qualified for Group-2 due to having more than $300,000 in capital, but according to the transaction list provided by Victim-1 on April 6, 2025, he had only transferred about 7.7 ETH, valued at about $14,811 at the time of the transfers, to 0x3A1A. Like Group-1, Group-2 contained members appearing to be other investors. Victim-1 reached out to at least one of these group members

("Member-2") who was using phone number +1 (771) 474-5180.[8] Member-2 told Victim-1 that he withdrew "20 million or more" in multiple transactions (Figure 8). Similarly to Member-1, Member-2 appears to be an account owned or controlled by the scammers to make the investment scheme appear more legitimate.

*Figure 8*



46.    Victim-1's purported investments became visible on the suspect website after every transaction, further giving the scam the appearance of a legitimate investment.

47.    On or about December 2024, Victim-1 attempted to withdraw his purported cryptocurrency investments with Suspect-1.  By that time, Victim-1 had sent about $353,590.98 to 0x3A1A. Suspect-1 indicated that, in order to withdraw his funds, Victim-1 had to pay a 15% fee on his "profits" (Figure 9). On December 11, 2025, after Victim-1 wired the needed amount to his

---

[8] Databases LeadsOnline and Qintel Crosslinks were queried for the phone number but did not return any subscriber information.

Coinbase Wallet, Suspect-1 directed him to transfer "90k ETH worth" to wallet address 0x50e3368820b1E9AA9911cf598aaFa6287ee4b1dd ("0x50e3").

*Figure 9*

```
[12/2/24, 10:08:52 PM] Assistant-Joshua: After
deducting the principal amount of $600,000, you
will have to pay a 15% fee on the profit portion
of 591,382.75
[12/2/24, 10:09:40 PM] ██████: Oh ok
[12/2/24, 10:09:54 PM] Assistant-Joshua: The fee
you need to pay is 88,707.4125
[12/2/24, 10:10:45 PM] ██████: Also do I have to
pay additional taxes?
[12/2/24, 10:10:47 PM] Assistant-Joshua: Prepare
the funds and wire transfer the deposit to the
coinbase account and transfer it to the coinbase
wallet, I will request the financial payment
address for you
```

48.  On or about December 12, 2024, Victim-1 inquired about the status of the withdrawal. He was directed, by Suspect-1, to contact the email address erc20teamservices01@gmail.com.[9] Victim-1 was asked to pay further fees and taxes to be able to withdraw his money (Figure 10). The addresses Victim-1 sent ETH to, as directed by these emails from "erc20 Teamservices," include but are not limited to:

    a.  0xfd1d91Fff69e8e5e834f5D7C824db86bc08ec280 (0xfd1d"),

    b.  0xED1DDAEDd43130ca6f3E86a4F6Fd 21Ff53058242 ("0xED1D"),

    c.  0x906374D207dC54a639c92E7B39Bf26386fD7668e ("0x9063"), and

    d.  0xcE3a2a9Debc600e03A5b37e89f7823727BEbBA3 ("0xcE3a").

---

[9] Commercial and law enforcement databases yielded no information on the email address.

*Figure 10*



Flow of Funds Across Blockchain

49.     Victim-1 made about 59 transfers totaling about 506.47 ETH from on or about October 12, 2025, to March 4, 2025, to seven wallet addresses believed to be owned or controlled by the suspects, both on the ETH and Base networks (Figure 11). Total value of ETH sent by the victim to the suspect wallets totaled about $973,551.01 at the time of the transfers.

*Figure 11*

| Suspect Address | Amount in USD | Transactions |
|---|---|---|
| ETH Network | | |
| 0x05a3a27deae84bc688570d45dbe0c8fd82ec6765 | $ 155,575.42 | 4 |
| 0x3a1a2294eb65c008dbbae0104004f70ba4cf32ce | $ 412,638.08 | 41 |
| 0x50e3368820b1e9aa9911cf598aafa6287ee4b1dd | $ 130,344.12 | 4 |
| 0x906374D207dC54a639c92E7B39Bf26386fD7668e | $ 4,757.83 | 1 |
| 0xED1DDAEDd43130ca6f3E86a4F6Fd 21Ff53058242 | $ 58,829.68 | 3 |
| 0xcE3a2a9Debc600e03A5b37e89f7823727BEbBA3 | $ 116,481.45 | 1 |
| 0xfd1d91Fff69e8e5e834f5D7C824db86bc08ec280 | $ 70,444.88 | 2 |
| Base Network | | |
| 0x3a1a2294eb65c008dbbae0104004f70ba4cf32ce | $ 24,479.55 | 3 |
| **Total** | **$ 973,551.01** | **59** |

50.     These transactions include five transfers (collectively, the "Subject Transactions"), from the victim wallet 0xb7ad to some of the listed receiving addresses shown in Figure 11. Subject Transactions 1–5 were purportedly "taxes or fees" Victim-1 was directed to pay by Suspect-1, purporting to serve a customer service role.

51.    Victim-1 was directed, on January 9, 2025, to send 36.65 ETH to 0xfd1d as a "deposit to secure" his withdrawal. He was directed, on February 5, 2025, to send this amount in multiple transfers, and ultimately made two payments totaling about 36.65 ETH to 0xfd1d (Subject Transactions 2 and 3).[10] On February 18, 2025, Victim-1 was told by erc20 Teamservices that an administration fee of 15.3 ETH needed to be sent to 0xED1D due to the withdrawals staying "on the money chain for more than 30 days or more." On February 19, 2025, Victim-1 made the payment (Subject Transaction 4).[11] On the same day, he was directed by erc20 Teamservices to pay 60.6 ETH for taxes to 0xcE3a and 2.475 ETH to 0x9063 for the withdrawal transfer. He made the 2.475 ETH transfer on February 19, 2025 (Subject Transaction 5)[12] and the 60.6 ETH payment on February 27, 2025 (Subject Transaction 1).[13]

*Figure 12*

|  | Date/Time | Receiving Address | Amount |
|---|---|---|---|
| Subject Transaction 1 | 02/27/2025 18:37 | 0xcE3a | 60.6004 ETH |
| Subject Transaction 2 | 02/11/2025 14:10 | 0xfd1d | 27.6497 ETH |
| Subject Transaction 3 | 02/06/2025 02:41 | 0xfd1d | 8.999740 ETH |
| Subject Transaction 4 | 02/19/2025 18:04 | 0xED1D | 15.3003 ETH |
| Subject Transaction 5 | 02/19/2025 21:56 | 0x9063 | 2.475299 ETH |

52.    Suspect-1 was involved in at least one of the Subject Transactions: on or about February 20, 2025, Suspect-1 messaged Victim-1, confirming the information Victim-1 was receiving from erc20 Teamservices about the need for a 60.6 ETH tax (Figure 13).

---

[10] Transaction hashes 0xb63072696b1d74a45223fae851673507fe534093f1064465cececb566cfb6caf and 0x21fb41fa86f3f5e8ee95cbce4e4ac49f6bb5f6e47f2dbd7eccec359d6dce9062.
[11] Transaction hash 0x66ac27f61362e6c8546b9da87068c3cfa0d56ca0fd8ce7ed2d1729c8d59c7903.
[12] Transaction hash 0x20caa7e98399501d251c66feb4bf814e073a5bfedbddb91f76687989cfd7596f.
[13] Transaction hash 0x17457606d54365a0acda858ec1ae96eaaef656d374cc0d5fbb90cb4f2631e5b9.

*Figure 13*



53.    On or about March 31, 2025, the funds from Subject Transactions 1–5 were transferred from the receiving addresses to the wallet address 0x0dB823845647dF8fF6F2f6549efB9fF1ee145BaE ("0x0dB8") (Figure 14).[14]  For transactions occurring within 0xcE3a, 0xfd1d, and 0x9063, the beginning balance before victim transfers were 0.0 ETH, and there were no other deposits or withdrawals before victim funds are transferred to 0x0dB8. For the transaction occurring within 0xED1D, the beginning balance before the victim transfer was approximately 0.249 ETH, and there were two deposits and two withdrawals before the 15.54 ETH transfer into 0x0dB8. Applying the LIFO tracing methodology, the 15.54 ETH transferred to 0x0dB8 comprised 15.30 ETH of victim funds and approximately 0.24 ETH from the prior balance.

---

[14] The tracing method Last in First Out (LIFO) was used to determine source and movement of victim funds.

*Figure 14*

| Date/Time | Transaction Hash | From | To | Amount |
|---|---|---|---|---|
| 03/31/2025 16:13 | 0xe9656cd4bd55505dfcfab912dc590b41eabe081db67c3fb7f6d1968f4ac80e08 | 0xcE3a | 0x0dB8 | 60.6003 ETH |
| 03/31/2025 16:07 | 0x140c2ee182f62be4f7af564ff3870504a02703c47a68a08e80b01d6f9b952107 | 0xfd1d | 0x0dB8 | 36.6494 ETH |
| 03/31/2025 16:14 | 0x0205eb8d0e6c860e4b3ce608fa9cc0aa38fa51ed5b56141718da93e52467cb3d | 0xED1D | 0x0dB8 | 15.54 ETH |
| 03/31/2025 15:59 | 0x8a76d0dd34cce11a6f93a18b8c290c48d8a6189dc30916efce9c5c9866cf1c18 | 0x9063 | 0x0dB8 | 2.475263 ETH |

54.     On or about July 19, 2025, 170 ETH was transferred out of 0x0dB8 into wallet address 0xCaB3644BdeEf0fdb41dE86D386C967C5a31f172D (Subject Address).[15] While 100 ETH was transferred out[16] before the 170 ETH transaction, the 100 ETH was funded by three deposits totaling approximately 102.819 ETH that followed the victim fund deposits detailed in Figure 14. Therefore, pursuant to LIFO, the 170 ETH transfer was funded, in part, by all the funds comprising the Subject Transactions, totaling approximately 115.02 ETH of Victim-1's funds. A visual depiction of the tracing of victim funds is shown below in Figure 15.

*Figure 15*



---

[15] Transaction hash 0xa3c2fe04df47ed8ce43ec8afa3c2f6257c9574853f8e59e80002b111ac27ae0f.
[16] Two transactions to HTX with hashes 0x33f3bc555e47b71a657f9ed84a34e54fcf9ad39e3c9b1c33f765a7b587bb24ed and 0xb1a59b7b8a2162cb62fe3a3dcb9a4d22244d6f58a5792df2f92b9f89873f2d2b.

55.    Based on LIFO, the 170 ETH transaction is attributable to the following sources:

a.    approximately 115.02 ETH traceable to Victim-1's funds, as described above;

b.    approximately 2.819 ETH remaining from the 102.819 ETH deposits from unknown sources that followed the deposits of Victim-1's funds;

c.    a 4.66 ETH transfer that could not be attributed to a victim;

d.    a 15.3 ETH transaction that could not be attributed to a victim; and

e.    approximately 31.956 ETH of a transfer of 232 ETH into 0x0dB8 from wallet address 0x457305c662AA454Bd7B7c11b6C3Fa14de71bE174 ("0x4573") that contained comingled victim funds, as further described below.

56.    From its initiation, 0x4573 received 11 deposits, totaling approximately 232 ETH, and transferred all in one transaction, on December 25, 2024, to 0x0dB8. Approximately 182.28 ETH of the 232 ETH transfer was traced back to Victim-1's 0xb7aD address, as shown on Figure 16. Therefore, 31.956 ETH of the 170 ETH sent to the Subject Address contained comingled victim funds.

*Figure 16*



57.    The beginning balance of the Subject Address was 0 ETH prior to the 170 ETH transfer from 0x0dB8 on July 19, 2025. About 3 minutes after this transfer, the 170 ETH funded a 165 ETH transfer out, valued at approximately $585,479, accompanied by a 581761.60 USDT (Subject Currency) deposit in, valued at approximately $581,761.60, occurring simultaneously. Due to these transactions sharing a transaction hash, occurring simultaneously, having similar values, and the initial receiving wallet being a smart contract attributed in the blockchain as "Bitget: Swap 3," the 165 ETH, which was funded completely by the 170 ETH transfer from 0x0dB8, was swapped for the Subject Currency within the Subject Address using Bitget, a DEX.[17] There were no other deposits or withdrawals between the 170 ETH deposit and the use of 165 ETH for this ETH to USDT swap. Only USDT currently held by this wallet is the USDT received in this swap.

58.    Based on the flow of Victim-1's funds to the Subject Address, the Subject Address contained virtual currency primarily composed of known victim funds in the following amounts: approximately 115.02 ETH was traceable to funds belonging to Victim-1, and approximately 31.956 ETH was traceable to a transfer that comprised Victim-1's funds comingled with other funds, with Victim-1 funds making up 78.6% of the transfer. Therefore, by LIFO, of the 170 ETH that directly funded the 165 ETH swapped for the Subject Currency, about 67.7% is fully attributable to Victim-1 (about 115.02 ETH) and about 18.8% is comingled victim funds. Figure 17 shows the combined tracing of these funds from Victim-1's Coinbase Wallet address 0xb7aD to the Subject Address.

///

///

---

[17] Transaction hash
0xbdb0055a92ad416a23ba9451d9da061d81cdff280583e87cda9b43cc32c2bc1e.

*Figure 17*



59.     The above flow of funds is indicative of money laundering using cryptocurrency, especially for CIF. At each stage above, various methods commonly used by individuals laundering money were used to frustrate law enforcement's ability to trace, and ultimately recover, any illicit proceeds. Those methods include:

a.     *Use of a Victim-Controlled Unhosted Wallet (0xb7ad, Figures 5 and 6).* Criminals often coach victims to create unhosted wallets to receive victims' funds at the outset of the laundering process. In Victim-1's case, Victim-1 used Coinbase Wallet.

b.     *Use of Unattributable "0-Level" Deposit Addresses (Figures 11, 12, and 15).* 0-Level addresses are the initial deposit addresses that CIF scammers provide victims to deposit their funds on the blockchain. Criminals usually provide 0-Level addresses associated with unhosted wallets to evade identification or potential interference by third parties. Such is the case here with

the addresses listed in Figure 11. These 0-Level addresses are oftentimes only shared with one victim to make it more difficult for law enforcement and others to track and report common scams.

c.      *Use of Decentralized Exchanges (Bitget).*    DEXs allow users to swap one cryptocurrency type for another, often without having to provide any identifying information (i.e., know your customer ("KYC") data), so users can remain anonymous. Victim-1's funds were swapped from ETH to USDT using Bitget, a DEX.

d.      *Swapping for Stablecoins, Especially USDT (Figures 15 and 17).* CIF scammers involved in laundering victims' funds regularly exchange or "swap" the non-stablecoin cryptocurrencies that victims send them for stablecoins, especially USDT. According to investigators, money launderers are particularly drawn to USDT because of its low transactions fees and stability compared to other more volatile cryptocurrencies. Additionally, USDT is compatible on several different blockchains, which makes it easier to move funds across blockchains to further obfuscate the nature, source, control, and/or ownership of criminal proceeds.

e.      *High Velocity Flow of Funds to Consolidation Wallet. (Figures 16 and 17).* Once deposited into the 0-Level Address, it is common for funds to be transferred quickly from address to address before reaching the consolidation wallet, where the funds will often rest for a longer period, allowing criminals time to comingle those funds with other illicit gains before moving the funds again from the consolidation wallet towards a cash-out point where they can convert the pool of funds to fiat currency. Victim-1's funds reflect this method on numerous occasions by being transferred into, and out of, addresses in a short period of time.

f.      *Use of Consolidation Wallet to Comingle Funds. (Figures 15–17).* Defined as the "layering" stage of money-laundering, funds derived from multiple victims are routed to the same address, where they are comingled, consolidated, and transferred together downstream.

Criminals use consolidation wallets to obfuscate the source of funds and complicate tracing efforts by investigators. Victim-1's funds were comingled at multiple steps, and ultimately passed through multiple consolidation wallets containing funds from other sources, before being sent to the Subject Address.

60.    There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers using all of these methods. Whether ETH or USDT, each individual cryptocurrency transfer costs money. For USDT, that cost comes through the payment of transactions fees, or "gas" fees, required by the Ethereum blockchain. It is reasonable to assume that businesses and individuals would strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible. Furthermore, each transaction delays the whole process, defeating one of the key attributes of cryptocurrency as a quick means of exchange.

61.    Based on this evidence, and additional evidence outlined below, unknown subjects orchestrated a criminal CIF scheme against Victim-1 and laundered Victim-1's funds into the Subject Address.

### Freeze of Subject Address and Seizure of Defendant Property

62.    The Subject Address is an unhosted wallet address the owner of which cannot be easily identified. Pursuant to a law enforcement request, Tether froze the Subject Currency (approximately 581,761.620229 USDT) associated with the Subject Address.

63.    Following the freeze, an individual using the email address liao740742987@gmail.com and alias Liao740742987 claimed ownership of the funds and required clarification on the reason for the freeze. Tether provided the individual with contact information for the United States investigators. As of the date of this filing, this individual has not contacted the investigators or otherwise tried to claim ownership of the Subject Currency with the United States.

26

64.     On or about January 29, 2026, the United States obtained a warrant to seize the Defendant Property for forfeiture. Pursuant to the warrant, on or about March 3, 2026, Tether burned the Subject Currency (approximately 581,761.620229 USDT) associated with the Subject Address and reissued the equivalent value of USDT tokens (the Defendant Property) to a United States law enforcement-controlled virtual currency wallet.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(C))

65.     The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

66.     Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(A))

67.     The Defendant Property constitutes property involved, or traceable to property involved in, (a) domestic and international concealment of money laundering transactions committed in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i); and (b) a conspiracy to engage in money laundering, committed in violation of 18 U.S.C. § 1956(h).

68.     Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

### PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why

the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

/s/ Jehiel Baer
Jehiel Baer
WSBA No. 46951
Assistant United States Attorney
United States Attorney's Office
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-4169
Jehiel.baer@usdoj.gov

/s/ Rick Blaylock, Jr.
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

28

## VERIFICATION

I, Giuliano DiRissio, a Special Agent with the United States Secret Service, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this ____24____ th day of ____March____ 2026.

_____
Giuliano DiRissio
Special Agent
United States Secret Service

29